136 N.J. Super. 271 (1974)
345 A.2d 808
STATE OF NEW JERSEY, PLAINTIFF,
v.
RUBIN CARTER AND JOHN ARTIS, DEFENDANTS.
Superior Court of New Jersey, Passaic County Court, Law Division (Criminal).
Decided December 10, 1974.
*275 Mr. John P. Goceljak, Assistant Prosecutor of Passaic County, and Mr. Joseph D.J. Gourley, Prosecutor of Passaic County, attorney, appearing for the State of New Jersey.
Mr. Paul J. Feldman appearing for defendant Rubin Carter.
Mr. John W. Noonan appearing for defendant John Artis.
Mr. Stanley C. Van Ness, Public Advocate, and Mr. Richard Newman, of counsel, for defendants.
LARNER, A.J.S.C.
After a lengthy trial at which I presided during April and May 1967 defendants were convicted by a jury of murder in the first degree with a recommendation of life imprisonment. Life sentences were accordingly imposed on June 29, 1967. The convictions were affirmed by the New Jersey Supreme Court (54 N.J. 436 (1969)) and certiorari denied by the United States Supreme Court, 397 U.S. 948, 90 S.Ct. 969, 25 L.Ed.2d 130 (1970).
On or about October 1, 1974, approximately 7 1/2 years after the completion of the trial, defendants moved for a new trial on the ground of newly discovered evidence. R. 3:20. The application was founded upon affidavits of two state witnesses, Alfred Bello and Arthur Dexter Bradley, recanting significant portions of their trial testimony relating to the identification of defendants at the scene of the murder. *276 The court thereupon granted an evidentiary hearing to permit defendants and the State to present at a plenary proceeding all the available evidence relevant to the determination of whether a new trial should be granted.
Prior to the evidentiary hearing defendants expanded in their brief upon the asserted grounds for a new trial by alleging that they had been denied due process under the Fourteenth Amendment of the United States Constitution because the State had permitted without correction the same witnesses to perjure themselves in testimony relating to promises of leniency in sentencing on unrelated criminal charges pending against them.
Testimony was adduced on the two facets of attack and the court will deal with both issues herein.
In order to place the new trial application in proper focus it is necessary to review the operative facts as developed at the trial in 1967. First there will be summarized the evidence without consideration of the testimony of the recanting witnesses.

I
On June 17, 1966, at approximately 2:30 A.M., two black men entered the Lafayette Bar and Grill located at the corner of Lafayette and 18th Streets in the City of Paterson, with one man brandishing a revolver and the other a shotgun. Without provocation and without a clear motive they proceeded to shoot at all the occupants of the bar, as a result of which three persons died and one was severely injured. Because of the nature of his injury and the accompanying shock the lone survivor was unable to describe the assailants beyond the fact that they were Negroes.
Patricia Graham Valentine lived in an apartment on the second floor of the building in which the tavern was located. The noise of the shots awakened her, whereupon she ran to the window facing on Lafayette Street. She saw two black men running on the sidewalk below toward a white *277 car parked about a car width from the curb. She could not see their faces. However, she observed that it was a white car with a license plate which had a dark blue background with yellow or gold lettering. In addition, she testified that the rear lights had the unusual shape of tapering triangles. When the vehicle took off with the two men she hurried to the tavern, saw the horrible bloody scene and called the police. When she reached the door of the bar she saw the witness Bello and subsequently attempted to give succor to the victims.
When the police arrived shortly thereafter she told them what she saw, including the description of the automobile and providing a sketch of the tail lights. Shortly thereafter a white vehicle was returned to the scene which was identified by Mrs. Valentine as the one she had seen earlier. Further corroborative identification of the tail lights and the license plates took place at the police garage later.
Another neighbor across the street, Ronald Ruggiero, also heard the shots and when he looked out the window he saw the witness Bello running on Lafayette Street from 18th Street toward 16th Street. He also heard the screech of tires and saw a car shoot past his window with two colored men in the front seat.
As a result of an alert to look for a white car with out-of-state license plates and "butterfly" rear lights, and with two black occupants, within a half hour the police located a car in Paterson with defendants in the front seat. The vehicle was owned by Avis Rent-A-Car and had been rented some time before by defendant Carter. It was a 1966 white Dodge with New York license plates and had the odd "butterfly" tail lights described by Mrs. Valentine.
Detective Di Robbia searched the inside of the car at police headquarters at about 3:45 A.M. and found a 32-caliber Smith & Weston long live shell under the front seat. When he showed this to Carter the latter merely shrugged his shoulders. The evidence established without peradventure *278 that all the spent bullets found in various areas of the tavern and in the bodies of some of the victims were 32-caliber Smith & Weston long ammunition. There were also retrieved from the bar a spent shotgun shell and many pellets and pieces of wadding. Similar pellets and wadding were removed from the body of one of the victims. The expert identified these as having come from a 12-gauge shotgun. During the search of the car Detective Di Robbia also found a live 12-gauge shotgun shell in the trunk. (This shell was excluded from evidence at trial, but was considered admissible by the Supreme Court, 54 N.J. at 450.)
The remaining significant evidence was developed by the testimony of Bello and Bradley.

II
Around the time of the shootings Bradley was in the process of attempting to break into the plant of the Ace Sheet Metal Co. at the corner of 16th and Lafayette Streets, and Bello was acting as the lookout for the police. Bello testified that while he was standing at the corner of Lafayette and 16th Streets he saw a white car with two colored men in the front seat. He thereafter walked across the street to the northwest corner of that intersection to get a can of soda from a machine located there. He then walked back and spoke to Bradley, who was having trouble opening the door of Ace Sheet Metal. He proceeded to carry on his lookout duties at a tree near the corner when he again saw the white car cruising at about five to ten miles an hour, turning from Lafayette Street onto 16th Street.
He testified that the car at that time had two colored men in front and perhaps someone in the rear. The passenger in the front seat had something between his legs which looked like a rifle or a shotgun. The witness identified the car as the Carter car from a photo shown to him in court. Bello continued his walking tour back to Bradley *279 and then back to the corner, continuing down Lafayette Street toward 18th Street.
While walking toward the corner location of the Lafayette Bar and Grill for the purpose of getting cigarettes at the tavern he heard two shots and then two more shots. By that time he had reached the end of the building which housed the tavern. At that point he saw the white car parked on Lafayette Street and two colored men coming toward him from around the corner of 18th Street and Lafayette, talking loudly and laughing, with one carrying a shotgun and the other a pistol. They were 12 to 14 feet from him when he observed them. He also noticed a woman in the upstairs window.
He testified that the man carrying the shotgun was defendant Carter and that the other man with the pistol was defendant Artis.
Upon seeing the two armed men he turned and ran toward 16th Street and turned into an alleyway. While he was in this area he returned to the sidewalk. At that time he saw the same white car which had been parked proceeding toward 16th Street, and as it slowed down momentarily he noticed that it had New York license plates and triangle tail lights which tapered toward the outside.
Thereupon Bello proceeded to the bar and went in the side door located on Lafayette Street. He described the scene of the bodies in the tavern and also saw Mrs. Valentine enter for a moment and scream. He then went behind the bar to the cash register, saw one of the dead men lying there and helped himself to some of the cash in the register.
He subsequently left the tavern and joined his partner Bradley in an alley behind the Ace Sheet Metal building. He handed him the stolen cash and then returned to the bar and called the police.
Bello remained at the scene after the police arrived, and shortly other police cars pulled up with a white Dodge car and two black men. At that time and at police headquarters *280 that morning he failed to identify either defendant, contending that he did not see their faces. However, he did tell police that very morning that the car brought to the scene was the same one he had seen earlier. He did not tell the police at that time about Bradley or the criminal mission being carried on by them, or the fact that he had removed cash from the register in the tavern. In his court testimony, however, he admitted his involvement with Bradley and the theft of the money. In addition, he testified that he recognized defendants Carter and Artis when they were returned to the scene in the white Dodge as the same men he had seen on the street coming around the corner from the entrance of the Lafayette grill with the guns in their hands.
After he was confronted with his failure to identify defendants in his oral statement to the police on June 17, 1966 his credibility was rehabilitated by a written statement given to the police on October 14, 1966. In that statement he recited the facts in detail along the lines of his trial testimony and with positive identification of defendants. When asked at trial why he did not identify Carter and Artis on June 17, 1966 he stated that he realized he was involved in a "conspiracy to break and enter," that he had recognized the two men and that he feared retribution if they had recognized him. He further expressed concern because of involvement as a possible parole violator.
Bradley testified at the trial that he was in the process of attempting to pry open the door of Ace Sheet Metal Co. with a tire iron when a car passed by. As a result he threw the tire iron into the weeds. After a conversation with Bello he found the tire iron and went through an alleyway facing Lafayette Street. At that time he saw a car proceeding on Lafayette toward 18th Street. It was a new *281 white car which he thought to be a 1964 Ford. In the car at that time he saw four Negroes with two men in the front seat. The passenger had something between his legs which was long and thin. A photograph of the Carter car was identified by him as being similar to the vehicle he saw. He recognized the driver of the car as Rubin Carter. He knew his face from having seen his picture in magazines and from having seen him in Paterson. (Carter was a well known professional boxer).
Bradley then returned to his activity at the Ace Sheet Metal door without success, at which time he heard what sounded like backfiring or rifle or gun shots. He left the Ace door and again went through the alleyway to Lafayette Street. As a result of a prior conversation with Bello he knew that Bello had gone toward the Lafayette grill and so he started running on Lafayette Street in that direction. He saw someone walking further down the street toward the tavern but wasn't sure whether it was Bello. He did not wish to call out to him in the dead of night and so attempted to catch up with him. At a point about halfway toward 18th Street he heard more noises which sounded like backfiring or gun shots. As he continued he saw two Negroes coming toward him with one carrying a rifle or shotgun. He was not sure what the other man had in his hand. One was short and the other tall. Rubin Carter was identified by him in the courtroom as the one carrying the shotgun. He did not recognize and could not identify the second man. Bradley ran to his place of refuge in the alleyway, whereupon Bello ran up to him and gave him some money.
Sometime later he walked to the corner scene at the Lafayette grill where a crowd had gathered and spoke to Bello. While there he saw Carter and another man standing on Lafayette Steet near the side of the bar building and the car which was similar to the one he had seen previously. He said nothing to the police at that time about what he *282 had seen or about his own criminal activities. He was given a ride downtown in a police car and from there took a taxi to the house of a girl friend.
Subsequently that same morning he returned to the Ace Sheet Metal door in a car owned by a friend, Kenneth Kellogg, and managed to break the lock and enter the premises. He found no money and left by the rear door, ultimately driving home.
The defense had available two written statements of October 14, 1966 and November 18, 1966, the report of an oral statement of October 6, 1966 and Bradley's grand jury testimony of October 31, 1966. On cross-examination Bradley stated that he thought he was "giving them the whole truth" when he appeared before the grand jury.

III.
The defense testimony consisted of the denial of the charges and a vain effort to establish an alibi. The character of the alibi testimony is well described in the Supreme Court opinion of Chief Justice Weintraub:
* * * They produced a number of witnesses in an effort to place themselves at a bar at the time of the murders. It, however, was virtually impossible to establish an alibi, for at all times defendants were concededly within minutes of the murder scene and the moment of the killings could not be established precisely. It is fair to say that the case had to turn upon the State's proof and the defendants' denial of guilt, unaided by the testimony which sought to establish an incompatible presence elsewhere. [54 N.J. at 441]

IV
As already noted, one of the grounds urged for a new trial is the recantation by the witnesses, Bello and Bradley, as presented under oath at the evidentiary hearing.
Bello testified at this hearing that he lied during the trial with respect to his identification of Carter and Artis as the persons whom he saw with guns in hand shortly after the shooting at the Lafayette bar. He did not, however, *283 recent any other trial testimony as to his actions or observations during the morning of the crime. He asserted that he was "molded" by "Passaic County" to become a "stool pigeon" mainly through the pressure exerted by Lt. DeSimone, the prosecutor's detective in charge of the investigation.
The first time that he told anybody that he lied in his trial testimony was in a statement given to an investigator of the Public Defender's office on September 19, 1974.
Bradley was more expansive in his recantation, claiming that in fact he did not see any black males that morning in the involved area and more particularly did not see or recognize Carter as he had testified at the trial. In fact, he asserted that he never heard any shots and did not proceed on Lafayette Street toward the bar so as to be in a position to observe any persons coming from the entrance. Furthermore, he denied the truth of the testimony relating to his observations of a white car and the identification of the Carter car.
In effect, Bradley contended at the hearing that all his testimony concerning the cruising vehicle and the presence of two black males on the sidewalk and the recognition of Carter was false. He testified that it was all made up as a figment of his imagination recreated from what he had heard from others. He also stated, however, that his trial testimony was not the result of any threats or pressure from anyone. Nobody told him what to say, whether it concerned his actions, his observation of the car and its occupants, his observation of the two black males on the street or his recognition of Carter. In toto, he testified that between the time that he first admitted some knowledge of the events in October 1966 and his trial testimony in May 1967 no one had directed him what to say or testify.
This witness also failed to tell anyone that his trial testimony was untrue until May 1974, when he signed a statement for an investigator.

*284 V
The foregoing recantations present to the court two conflicting versions under oath of both witnesses. Does the mere fact that State's witnesses give recanting post-trial testimony necessarily entitle defendants to a new trial? Obviously not! If mere recantation in itself dictates a new trial, the entire judicial process could be frustrated by the mere whim of a witness recanting his testimony.
Initially, a motion for a new trial on the ground of newly discovered evidence must meet three basic criteria. The new evidence must be: (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the original trial and not discoverable by reasonable diligence prior thereto, and (3) of the sort which would probably change the jury's verdict if a new trial was granted. State v. Artis, 36 N.J. 538, 541 (1962); State v. Johnson, 34 N.J. 212, 222 (1961); State v. Vaszorich, 13 N.J. 99, 130 (1953); State v. Puchalski, 45 N.J. 97, 107 (1965); State v. Bunk, 4 N.J. 482, 486 (1950); State v. Sullivan, 43 N.J. 209, 233 (1964).
As conceded by the State, the nature of the recanting evidence herein and the facts relating to its discovery are such that defendants meet the judicial criteria set forth above.
However, in addition to the necessity of finding that the new evidence complies with the foregoing criteria, the court has an additional burden and function when the newly discovered evidence consists of recanting testimony. The court must determine whether the new testimony is true and the trial testimony false by application of a standard of reasonable probability. Manifestly, the essence of the grant of a new trial based on recanting testimony is not that a witness says he lied at trial but whether the new evidence is probably true.
The Supreme Court of New Jersey in Puchalski, supra pointed out:
*285 The test for the judge in evaluating a recantation upon a motion for a new trial is whether it casts serious doubt upon the truth of the testimony given at the trial and whether, if believable, the factual recital of the recantation so seriously impugns the entire trial evidence as to give rise to the conclusion that there resulted a possible miscarrage of justice. His first duty is, therefore, to determine whether the recanting statement is believable. [45 N.J. at 107-108]
See also, State v. Vaszorich, supra, 13 N.J. at 130; State v. Bunk, supra, 4 N.J. at 488-491; State v. Johnson, supra, 34 N.J. at 227-228; State v. Sullivan, supra, 43 N.J. at 232-233; State v. Smith, 29 N.J. 561, 574-575 (1959).
As further observed by the Supreme Court in State v. Baldwin, 47 N.J. 379 (1966), cert. den. 385 U.S. 980, 87 S.Ct. 527, 17 L.Ed.2d 442:
Thus the trial judge must himself consider where the truth probably lies, and if the trial court is satisfied the present testimony of the recanting witness is unbelievable, the application must be denied. [at 400]
The sequel to the denial of a new trial in Baldwin was an application to the Federal District Court of New Jersey for a writ of habeas corpus which resulted in an opinion by Judge Whipple denying the writ. U.S. ex rel. Baldwin v. Yeager, 314 F. Supp. 10 (D.N.J. 1969), aff'd 428 F.2d 182 (3 Cir.1970), cert. den. 401 U.S. 919, 91 S.Ct. 905, 27 L.Ed.2d 822 (1971).
The principles applicable to the court's function in the consideration of a motion for a new trial based on recanting testimony cannot be expressed in better terms than the oft-cited language utilized by Judge Cardozo as a Judge of the Court of Appeals of New York in People v. Shilitano, 218 N.Y. 161, 112 N.E. 733 (1916):
"Three witnesses for the prosecution have stated under oath to the trial judge that their testimony upon the trial was false. It became his duty to say whether they were conscience-stricken penitents, or criminal conspirators to defeat the ends of justice... I do not mean that to justify a new trial, he must have been convinced  firmly or with a sense of certainty convinced  that the first story *286 of the witnesses was false and that their new story was true. He might act upon a reasonable probability. But if, on the contrary, he was convinced that the second tale was false, that a criminal league had been formed to set at naught the verdict of the jury and the judgment of the court, his duty was clearly marked. People v. Tallmadge, 114 Cal. 427, 46 Pac. 282; Parker v. Hardy, 24 Pick. (Mass.) 246, 249. He was not at liberty to shift upon the shoulders of another jury his own responsibility. That would have been to make the conspiracy triumph. He was charged with a responsibility to seek the truth himself." [112 N.E. at 739; emphasis supplied]
In the same case the majority opinion of Judge Seabury succinctly summarizes the suspect character of testimony of a witness in a criminal trial who subsequently recants:
"There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of criminal law know well its untrustworthy character." (At 736; emphasis supplied).
In the framework of this motion for a new trial the burden of proof rests with defendants to establish the believability of the new testimonial version so as to convince the court that there is a substantial possibility of a miscarriage of justice. State v. Baldwin, supra; State v. Smith, supra, 29 N.J. at 573.

VI
In assessing the credibility of the recantations of both witnesses the initial element which casts a cloud of suspicion upon them is the fact that neither one of them came forward with a confession of alleged perjury until seven years after the trial  a period of time which immunizes them from prosecution for perjury or false swearing arising out of their trial testimony.
Bello attributed his allegedly false identification of defendants to such reasons as the hope of a $10,000 reward, the "molding" by "Passaic County" and the questioning and strain that he was under. In the main, however, he focused his attack upon Lt. DeSimone as the one law enforcement *287 officer who pressured him into lying at trial. It is significant that in the affidavit upon which the motion was based Bello swore, "The pressure was by the Prosecutor's Office and the Police, namely Lt. De Simone and Assistant Prosecutor Hull." Yet at the hearing he failed to support the charge that Hull exerted any pressure on him. He again demonstrated his present lack of regard for an oath by testifying that at one point Captain Gourley of the Paterson Police "engineered it all" and then on cross-examination reluctantly admitted that his charge against Captain Gourley was untrue.
When Bello was first questioned by Detective Lawless of the Paterson police on the morning of the killings he gave no inkling of his own criminal involvement in the Ace Sheet Metal job or of the participation by Bradley. Furthermore, he failed to identify defendants as the persons he saw in the white car and on the sidewalk contiguous to the Lafayette bar. When confronted with this statement at trial he observed that he withheld the foregoing information because of fear of incriminating himself in the Ace Sheet Metal break-in and fear of physical harm from defendant Carter or his friends.
The uncontradicted evidence produced by the State at the new trial hearing is revealing as to the believability of Bello's current recantation.
In the latter part of July 1966, while the murders were still under investigation and before any arrests were made, Detective LaConte of the Paterson police saw Bello's car in the parking lot of a Paterson tavern known as "Frankie's Playpen." He entered the bar and engaged in conversation with Bello. The latter proceeded to talk about the shooting and for the first time told a police official that someone else was with him that night, namely, Arthur Dexter Bradley, who was supposedly in Massachusetts at the time. This conversation was reported to Lt. Rafferty, the officer in charge, and also to Sgt. Mohl.
*288 The next contact between the police and Bello was on or about August 4, 1966 when further questioning failed to produce anything more relating to identification. Although there was an ongoing investigation, it was not until October 3, 1966 that there was a breakthrough in the police effort. Detective LaConte had been cruising in his car in performance of his duties when at approximately 2:00 A.M. he saw Bello enter a tavern. The detective went in and started a conversation with him. Bello appeared very excited and blurted out, "I'm all messed up since this shooting happened * * * I'm scared." He continued to relate that he had been approached by a black female who told him that he had better not talk to the police about the Lafayette shootings. When LaConte pressed him on whether he knew who was responsible for the shootings, Bello said, "You had the man and you let him go," and ultimately named Carter. When he was asked at that time why he had waited so long to come forth with the information he pointed out, "I'm scared  Rubin Carter has friends  I have a brother who is in State's Prison. I have to think of him."
When told that he would have to go to the prosecutor with the information, Bello said, "If you go to Lt. DeSimone I'll deny everything." He did agree however to talk to Sgt. Mohl.
That same evening, at about 11:00 P.M., there was a meeting between Bello, LaConte and Mohl at the City Line Diner in Paterson. At that time Bello related the events of the morning of June 17 substantially consistent with his subsequent trial testimony and named Carter and Artis as the two individuals he saw coming around the corner of the Lafayette bar that morning. He further noted that Bradley also saw Rubin Carter.
The testimony of Mohl and LaConte in this connection establishes without question that Bello identified the two defendants many months prior to trial and at a time before *289 there could have been pressures from Lt. DeSimone, who is singled out by Bello as the inspiration for his trial perjury.
After the foregoing conversation Lt. DeSimone of the prosecutor's office was informed and Bello was brought to Wayne police headquarters for questioning on October 11. There were present at that time DeSimone, Mohl, LaConte and Bello, and a tape was made of the entire conversation. The tape reveals that Bello again volunteered the full story of the happenings of the morning of June 17 substantially similar to his trial testimony, including the unequivocal identification of Carter and Artis and the statement that the two men who were returned to the scene in the white car were the same ones who had come around the corner earlier. He stated that he had seen two black men come around the corner, one a little taller than the other. (Artis is taller than Carter.) He thought he knew the shorter man, that he had seen him, and that he was Rubin Carter. He had known Rubin Carter before; in fact, he had seen him in a boxing exhibition at Bordentown. He also saw Carter when he was brought back to the scene in the white car and later at the Paterson Detective Bureau the same morning. When asked, "Can you honestly say that this was the man that you saw around the corner?", his answer was, "Yes." He gave an affirmative answer to a similar question relating to Artis.
The tape includes a revealing portion of Bello's conversation with Bradley at the Ace Sheet Metal Co. location after the shooting:
So I like told 'em, you know cut out, cause you know, there was a shootin'. So he says uh, did you, uh, he said, did you see the car. So I says yeah. So he says hey Bello, uh, who you think was in it. I says Rubin Carter. So he says, that's who I think it was too.
On October 14, 1966 Bello gave a formal statement under oath at the prosecutor's office which was taken down stenographically and which contains in great detail a full narrative of everything he did and saw the morning of the *290 shooting. Again he reiterated, "I was positive it was Rubin Carter" and that his identification was fortified when he saw Carter and Artis at the scene and at police headquarters thereafter. He also repeated that when he failed to identify them on June 17 and 18 he was not telling the truth because "I know they had seen us and I was scared that they might do something to me."
In fact, DeSimone cautioned Bello in the following language: "You realize of course, Mr. Bello, that this is a serious allegation you are making; and I again ask you, is there any question in your mind that the two men you saw coming around the corner from the Lafayette grill immediately following the shooting were Rubin Carter and John Artis?" and Bello replied, "No, there is no question in my mind."
One other extra-judicial utterance of Bello is an important item of evidence in the court's search for the truth.
Kent Kellogg had been a witness at the trial and was called by the State as a witness at the post-trial hearing. Kellogg had driven Bradley and Bello to the area of the Ace Sheet Metal plant during the early morning of June 17. When he heard shots and subsequently saw police cars he left the scene and his associates, Bello and Bradley, and went to the apartment of Sylvia Smith on North 7th Street, Paterson.
Kellogg testified that later the same day Bello came to that apartment and a discussion ensued about the prior happenings. When Kellogg pointed out that he heard the shots and the police cars he asked Bello what had happened. Bello replied, "Rubin Carter shot up the whole bar." This conversation was also included in Kellogg's statement to the police on October 20, 1966 and his grand jury testimony on October 26, 1966.
All the foregoing oral and written pretrial statements reflect repeated reference to identification of defendants. The circumstances under which some of the references were *291 made and the naturalness of the context of the accompanying details bespeak of a truthful catharsis by the witness many months before trial.
Of course, a credibility determination involves not only the analysis of the probability of the testimony of the witness in the light of other evidence in the case, but also an appraisal of his credibility garnered from his character and demeanor.
Bello's memory at the new trial hearing appeared to be clear and fresh on direct examination when dealing with his single mission of contradicting the trial testimony pertaining to identification. However, when pressed on cross-examination on significant matters which might cast doubt on the credibility of his recantation, his memory became poor and he constantly resorted to the ploy, "I don't recall." And his extensive criminal record hardly adds to his trustworthiness as a witness. In fact, Bello's entire demeanor on the witness stand reflected a callous disregard and disrespect for law, oaths and the truth.
After a complete review of the evidence at trial and at the post-trial hearing the court finds that Bello's recantation is simply unbelievable.
Next we turn to consideration of the believability of the recanting testimony of Bradley. His post-trial testimony is also suspect because of the taint of the timing of his recantation and a formidable record of criminal convictions. As observed heretofore, his recantation related not only to the identification of Carter but to the entire panorama of evidence relating to his observations of the white car before and after the shooting, his observation of two black males before and after the shooting, and his movements between the Ace Sheet Metal plant and the Lafayette bar.
Bradley did not attribute his alleged perjury to any threats, pressure or suggestions from anyone. Supposedly *292 he created the details of his testimony sua sponte from information picked up by him from others with the hope that this would help him in connection with the many criminal charges pending against him.
Is this recent wholesale recantation of all the substantive trial testimony credible? In order to arrive at the answer to this question it is necessary to delve into the pretrial actions and statements of this witness.
On the morning of the shooting and for some time thereafter Bradley did not volunteer any information relating to the events of the shooting or his involvement at the Ace Sheet Metal plant. By the same token, the police had no idea that he was a witness to any of the facts and therefore did not question him.
On August 3, 1966 Bradley was arrested in connection with an investigation of a series of robberies and burglaries.
Because of information acquired by Detective LaConte from Bello a short time before, Bradley was also questioned briefly by one of the detectives as to his knowledge of any circumstances relating to the Lafayette bar shootings. However, no significant data was elicited from him at that time.
It was not until October 3, 1966 when Bello first revealed the entire story to Detective LaConte that the police had some knowledge that Bradley had witnessed some of the events surrounding the Lafayette bar shootings and had identified Rubin Carter as one of the men involved.
Armed with this information Detectives Mohl and Klicker made arrangements to interview Bradley at Bordentown where he was confined at the time. Bradley was told that the police knew that he had information that would help solve the Lafayette grill shootings. At first Bradley was hesitant, particularly because of the presence of a guard. Finally he told the detectives that "the person involved had a lot of fans and that his initials are R.C."
When the detective convinced the guard to leave, Bradley opened up and said that the man he saw with a rifle coming *293 around the corner was Rubin Carter. He could not identify the other man. Bradley expressed fear for his own safety at Bordentown if it was discovered that he had identified Carter and asked for help by way of a transfer to some other institution.
As a result of this interview Bradley was brought to the Passaic County Prosecutor's office on October 14, 1966. He was in custody on that day and throughout the period from August 1966 and thus had no opportunity to talk to Bello or arrange for a mutually consistent story.
On October 14, after the Bello statement was taken and without knowledge of the facts revealed by Bello, Bradley signed a full statement under oath as to what he witnessed on the morning of June 17. It contained in substance the facts to which he testified at trial and which he now rejects as untrue.
What is most significant in this statement and in his trial testimony is that the description of the events meshes with the testimony of Bello despite the fact that the witnesses never had the opportunity to concoct a consistent story. Moreover, the events collateral to the identification fit in with the testimonial description by Bello at trial which he still affirms.
The statement clearly and unequivocally reflects Bradley's recognition of Carter in the white vehicle prior to the shooting and as one of the men coming around the corner of the Lafayette bar with a shotgun or rifle in his hand. It was independent of the statement obtained from Bello and admittedly was a voluntary one untainted by threats or pressures of any type.
Thereafter on October 31, 1966, after consulting with his attorney and signing a waiver of immunity, Bradley testified before the grand jury in a vein similar to his October 14 statement and his trial testimony.
On November 18, 1966 he gave another statement to the police in which he confessed to the fact that after his first *294 unsuccessful attempt he actually broke into the Ace Sheet Metal plant on June 17 some time after the shooting incident  a fact which had been omitted from his prior statement because he had not been asked about his activities later in the day.
The foregoing pretrial revelations by the witness many months before trial, and the voluntary nature of their submission, leads but to one conclusion: the recent recantation of the oral and written statements before and during trial is patently untrue. It would require extreme gullibility to accept Bradley's current claim that all his significant testimony at trial was false when much of it is corroborated by Bello's admittedly true testimony. It would also require a total abandonment of normal mental processes for the court to accept as true Bradley's explanation that he created out of the whole cloth his specific and detailed descriptions of what he witnessed. Bradley's present recantations are totally unbelievable and are rejected as a basis for a finding of a possible miscarriage of justice.
It is urged by the defendants that no clear motive appears for the witnesses to contrive their recantations and that the absence of such motive lends credibility to their stories. As to Bello there is considerable evidence pointing to a revenge motive  revenge against Lt. DeSimone and the law enforcment system in general because nothing was done to help Bello in the recovery of a reward which had been offered by the City of Paterson, and also because DiSimone failed to exert himself to assist Bello in connection with subsequent criminal involvements. In addition, it is manifest that there exists an overwhelming fear in the minds of both witnesses  a fear of bodily harm because of their position as witnesses against a well known defendant who could wreak retribution through his power and influence among inmates in institutions so regularly frequented by Bello and Bradley.
And finally, it is even inappropriate to evaluate witnesses of this kind by seeking motives which might govern *295 ordinary members of our society. The criminal minds of Bello and Bradley are so devious and amoral that it is impossible for a court to analyze their motivations and mental gyrations in order to arrive at a reason for their conduct. Their actions and words before, during and after trial are a more reliable barometer.
It should be noted that the court is not called upon to retry the case or to review the propriety of the jury's fact finding of guilt. The conduct of the trial and the sufficiency of the evidence has already been reviewed and approved by appellate tribunals. At the trial the jury, not the court, exercised the function of determining the credibility of the witnesses. And in the case of Bello the jury had before it his initial statements denying recognition of the defendants, as well as his subsequent statement to the contrary. It therefore performed its function of passing upon Bello's credibility. The jury decided on the basis of ample evidence beyond a reasonable doubt that defendants did commit the murders. Such a verdict must stand in the absence of recanting evidence which has such a ring of truth as to convince a court that there has been a possible miscarriage of justice. That ring of truth is totally absent in the recontations of both witnesses.

VII
Defendants assert as another ground for a new trial that the State knowingly permitted false testimony to be utilized to obtain the conviction. This charge is made in connection with the testimony of Bello and Bradley relating to promises which may have been made by law enforcement personnel as an inducement for their testimony.
Passing over the question whether this attack is cognizable as newly discovered evidence in view of the fact that it was discoverable before and at trial by the exercise of reasonable diligence, and also passing over the question whether the issue is barred by the limitation period applicable to post-conviction *296 proceedings (R. 3:22-12), the court will nevertheless rule upon the merits of the argument because there is involved the fundamental issue of a fair trial.
The applicable law is clear. The State may not knowingly use false testimony to obtain a conviction, whether that testimony involves material facts of the crime or whether it goes only to the credibility of a witness. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); State v. Taylor, 49 N.J. 440 (1967); State v. Blue, 124 N.J. Super. 276 (1973); People v. Savvides, 1 N.Y.2d 554, 154 N.Y.S. 2d 885, 136 N.E.2d 853 (Ct. App. 1956). It is the duty of the State to reveal the falsity of the answer of a State's witness when proper inquiry raises the question. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Taylor, supra; Giglio v. U.S. 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1973).
Does the trial record therefore spell out false testimony by the witnesses in response to a proper inquiry? And if so, does it reflect a knowing dereliction of the duty of the State to reveal its falsity?
The thrust of defendant's argument relating to Bradley is focused upon the questioning of this witness on the subject matter of several pending criminal charges when he was recalled at the very end of the trial. When Bradley was called to the stand for the first time the State on direct examination elicited testimony as to prior criminal convictions. Cross-examination concentrated on re-emphasis of the nature and number of these past convictions. There were no questions posed at that time by the State or defendants as to promises pertaining to open charges against the witness. However, upon application to the court defendants were permitted to recall Bradley at the end of the trial for the limited purpose of continued cross-examination to establish the nature of the open charges pending against him. See State v. Mathis, 47 N.J. 455, 468 (1966). When counsel for defendants completed a series of questions which elicited affirmative answers to the existence of nine pending charges *297 as of October 1966, he affirmatively stated "no further questions."
Thereupon, on redirect, the prosecutor asked, "Mr. Bradley, did anyone ever make any promises or guarantees to you with respect to these pending charges?" Defense counsel objected to the question on the ground that it went beyond the scope of his examination. The objection was overruled and the witness replied, "No, there has been no promises made to me at all."
Thereafter the following questions were put to the witness by the Prosecutor:
Q. Did you ever have any conversation with anyone concerning these charges against you?
MR. BROWN: And I object to that.
THE COURT: That is too general, any conversations.
Q. Was anything ever said to you by anybody in law enforcement concerning these pending charges against you?
MR. BROWN: Objection to that as irrelevant and immaterial, your honor. The first question was one which he could answer. The other question, I submit, is irrelevant and immaterial.
THE COURT: You will have to make it more specific, Mr. Hull. This may involve all kinds of conversations.
Q. Mr. Bradley, you said you have received no promises or guarantees.
A. Yes.
Q. Did any one say anything to you about these charges with respect to what might be done?
MR. BROWN: I object to this, if your Honor please. This could cover nine different charges, nine different counties.
THE COURT: Yes. Did anyone make any promise to you with respect to the disposition in any manner of any of the charges which you admitted to Mr. Brown are pending against you?
THE WITNESS: No.
THE COURT: Anything further?
Q. At any time did anybody say anything to you about these charges, and you say you have no promises or guarantees, was anything said?
THE COURT: Well, that is a question 

*298 MR. STEIN: It has been answered.
THE COURT: That is a question that has no understanding. I am sorry. We certainly can't understand that question.
Q. Mr. Bradley 
THE COURT: The additional question that I guess Mr. Hull wants to ask you is: Was any such promise made with respect to these charges at any time from October to the present day?
THE WITNESS: No.
Q. Was anything said about them by anyone connected with law enforcement?
THE COURT: I have already sustained the objection to that.
MR. HULL: I have no further questions.
THE COURT: All right.
RE-CROSS EXAMINATION BY MR. BROWN:
Q. No one has foreclosed you from any hope in the future as to reward for your testimony here in terms of the pending charges?
MR. HULL: Your Honor, I just tried to bring out the information 
THE COURT: All right. Now he has opened the door. You may ask your question with impunity. Will you answer that question.
MR. BROWN: There is only one problem on your ruling.
THE COURT: You have a question you have asked. Do you wish the question answered or not?
MR. BROWN: The question has been objected to.
THE COURT: Do you wish the question answered or not?
MR. BROWN: I will withdraw that question and ask my own question.
THE COURT: You withdraw it? All right.
Q. Now, with respect to these charges against you, none of them have been disposed of at this time, is that correct?
A. No.
THE COURT: All right.
FURTHER REDIRECT EXAMINATION BY MR. HULL:
Q. Mr. Bradley, has anyone ever discussed with you the disposition of these charges?
THE COURT: Mr. Hull, I have already ruled on that three times. I have prevented Mr. Brown from going into it on your objection. That is all, Mr. Bradley. You may step down, unless there is something else which is proper.
MR. HULL: It would be in the nature of rebuttal, your Honor.

*299 MR. BROWN: Well, I 
THE COURT: All right. I think you had better come up here and advise me what the rebuttal is.
(Discussion at side bar with all counsel and the court)
MR. HULL: I have no further questions.
THE COURT: All right. You may step down. Now, may I say clearly and without equivocation that ends the testimony on the part of the State?
MR. HULL: That's correct, your Honor.
THE COURT: On the part of defendant, Carter?
MR. BROWN: That's correct, Sir.
THE COURT: And on the part of defendant, Artis?
MR. STEIN: Correct, Sir.
From the foregoing it is manifest that the defense, for tactical reasons, sought to bar any questioning relating to promises or other references by any law enforcement officials on the subject of the pending charges. Apparently counsel were satisfied to have the jury consider the credibility of the witness on the basis of the existence of the criminal charges and the effect on his testimony of the hope of reward. The entire trial record supports this approach, for the deliberate avoidance by the defense of questions seeking to elicit the existence of any promises or commitments as to sentence runs counter to what would normally be expected from the experienced and astute counsel representing defendants in this case. Another factor which may have dictated this tactic was the possibility of prejudice which might arise from collateral testimony elicited in response to this questioning concerning fears and threats which prompted requests for protection (discussed infra).
In fact, the summation of Mr. Brown, attorney for Carter, reflects the same tactical approach:
Now by contrast even with Bello, this man (Bradley) has a different kind of record, and one which is introduced solely because you can, if you so decide, determine that he hopes to get a break, get favor, some kind of reward as to the outstanding charges against him, and, therefore testified falsely, that is the only word, in aid of the state's position, on a conviction.
*300 It should also be noted that the judge was careful to instruct the jury on the subject in the following language:
You should also take into consideration whether or not the evidence establishes that the testimony of a particular witness is affected or colored by any hope of reward, either from a money standpoint or from the standpoint of favor or leniency with regard to pending criminal charges.
As a consequence the jury had before it from the evidence, the arguments of counsel and the judge's charge, the issue of the impact of the pending charges and hope of reward upon the credibility of Bradley's testimony. Although this fact does not of itself solve the legal issue involved, nevertheless it reflects the judge's "feel of the case" and the context in which the problem arose  factors which influence the decision whether there was clear-cut perjurious testimony on the subject which was knowingly permitted to stand by the State so as to deprive the defendants of a fair trial under standards set forth in the existing precedents.
The promises upon which defendants base their contention were those which were in fact made to Bradley by Lt. DeSimone. The subject matter of those promises were two-fold: (1) that he would do what he could to protect the witness from possible peril by a transfer to another penal institution, and (2) that he would advise the prosecutors and probation officers of the counties where the charges were pending that Bradley had testified in the Carter case so that this information would be available for consideration by the sentencing judges.
Even Bradley confirmed at the hearing, however, that nothing was said about a lighter sentence, that there were no deals relating to sentence, and that DeSimone repeatedly advised that he could not promise anything but that he would do what he could to help. Bradley testified at the post-trial hearing: "There was never any definite promises made."
In an unsolicited letter written by Bradley shortly after the trial (July 7, 1967) and intended for delivery to the *301 Governor (although never delivered), Bradley again sought help for placement in an institution where he might be safe from "the Muslims [who] are waiting to get me if I come to prison." In that letter Bradley reiterated:
On the night of June 17, 1966, my friend and I witnessed a murder. * * * My friend Alfred Bello and I didn't want to become involved, because we were both concerned about our welfare. That's why it took the police four months to find out we could help them.
So when the detectives did come to see me at Bordentown, I wondered if maybe some of Carter's friends at Bordentown might know I could help the police. And Carter being a Muslim and the middleweight contender for the boxing championship he was well liked and had many friends. Also most of these Muslims are in places like Bordentown and prison.
I told the Detectives that I would help them, so they had me returned to Passaic County jail right away.
Bello and I signed statements and I was transferred to the Morris County jail where I've been since. * * *
In that letter Bradley also revealed the true facts pertaining to the absence of any promises or deals relating to sentence on the outstanding charges. He wrote:
I didn't testify with the hope of getting probation or a suspended sentence for my own charges. I expected time. * * *

* * * * * * * *
I'd like to say right now, Mr. Hughes, that I didn't try to make any deals with the Prosecutors in Paterson. I just hoped that they would help me after I testified. I could have told them that I wouldn't testify unless they had all my charges dropped. But I didn't. * * * I made no demands on the Prosecutor in Paterson. He told me in the event I was given time, he would try to arrange to have me do it in Prison's honor farm, Leesburg.
It is clear from the testimony that Assistant Prosecutor Hull did not participate in any discussion with Bradley relating to his protection or to the notification of other county prosecutors of his cooperation as a witness in the Carter-Artis trial. However, he was aware of the fact that DeSimone had discussed this with Bradley.
It is true that subsequent to the trial both DeSimone and Hull did contact the prosecuting officials in the several counties *302 and informed them of the fact that Bradley had cooperated by testifying for the State in the Carter case. And the records establish that Bradley received a sentence of three to five years on the indictment in Union County and varying sentences in the other counties concurrent with the sentence imposed in Union. They also demonstrate that in each instance the fact of Bradley's cooperation was brought to the attention of the court either by the local prosecutor or the probation department, and that the respective judges took this fact into consideration in the imposition of sentence.
With regard to the place of confinement, Bradley was confined to Passaic, Essex, Union, Bergen and Morris County institutions from October 1966 until the completion of the trial and through the period involved in his pleas and sentences on the several pending charges. In all, he was out of Bordentown for 17 months for which he did not receive credit on his prior Bordentown sentence. And DeSimone did exert efforts to have Bradley transferred from Bordentown after his 1967 sentences, but without success.
From all of the foregoing the court finds that the answer of Bradley to the effect that no promises or guarantees were made to him with respect to the pending charges or their disposition did not constitute clear perjurious testimony. A fair interpretation of the understanding of the question on the part of the interrogator and the witness is that no concrete promise was made with regard to the disposition or sentences to be imposed in connection with the pending charges. Bradley affirmatively testified at the present hearing that there were no definite promises made by DeSimone. Nevertheless, he did testify as to the conversations with DeSimone on the subject, thereby demonstrating his concept of the dichotomy between promises as to sentence disposition and conversations as to notification of prosecuting officials of his cooperation. The same difference in meaning persisted in his mind both at trial and at the new trial hearing.
*303 He understood and the prosecutor intended that the term promise connoted a definite commitment relating to sentence or disposition. And the record is clear that no such commitment was made by anyone.
Significant and corroborative of this conclusion as to the semantic problem involved is the fact that the prosecutor made several efforts to elicit the information as to the conversation with DeSimone about the assistance he would exert through questions which were couched in terms of "Did you ever have any conversation with anyone concerning these charges against you? * * * Was anything said to you by anybody in law enforcement concerning these pending charges against you? * * * Did anyone say anything to you about these charges with respect to what might be done? * * * Was anything said about them by anyone connected with law enforcement?"
Unfortunately, defense counsel for his own reasons objected to these clarifying questions and his objections were sustained by the trial judge.
Under such circumstances the case at bar differs from all the cases cited supra in which a new trial was granted because of the failure of the State to reveal the falsity of the testimony of its witness. In all the decided cases the clear falsity of the witness's testimony was established. The perjury was patent and could have been recognized as such by the prosecutor so as to compel him to reveal the truth to the jury. Such a finite picture is essential for the court to conclude that a defendant was denied a fair trial. Cf. Jackson v. U.S., 338 F. Supp. 7, 10 (D.N.J. 1971).
In contrast, in the trial herein the answer to the question was not unequivocally false, and the bona fide efforts of the prosecutor to draw out the witness on statements by law enforcement personnel which fell short of promises were frustrated by counsel's objections.
Another feature of distinction between the controlling precedents and this case involves the dissimilar fact patterns underlying the charges pending against the State's witness. *304 In the cited cases the involved witness was an accomplice who turned state's evidence. The charge against that witness was therefore pending in the same jurisdiction as the charge against defendant. As a consequence the responsibility and control of the prosecution of the witness as well as defendant rested with the same prosecutor having control of the case on trial.
Under such a set of facts a promise by the prosecutor or a member of his staff that he will not indict, or will prosecute for a lesser offense, or recommend a specific or a lenient sentence has the high potential of accomplishment. It is akin to a plea bargain. Hence, any promises or representations to a witness in such a setting convey the meaning of definite commitment upon which the witness relies.
In our case the charges against Bradley did not involve the crime at issue but concerned unrelated offenses, some of which were pending in other counties and over which the Passaic County Prosecutor had no power or jurisdiction. It is for that reason, perhaps, that DeSimone's references were limited to his undertaking to notify the other prosecutors of Bradley's cooperation. He did not and could not make any definite promises pertaining to sentence or disposition on the out of county charges. And Bradley with his background of criminal experience well knew that. Hence, when Bradley was asked whether any promises were made he answered truthfully both at trial and at the hearing that there were none, an answer which was consistent with his concept of a promise as a commitment on sentence or disposition.
In light of the ambiguous set of circumstances involved herein it cannot be said that the State knowingly permitted perjurious testimony by one of its witnesses. The nature of the questions and answers and the context in which they were presented did not result in an unfair trial. And since defendants are constitutionally entitled to a fair trial, not a *305 perfect trial, they have not been deprived of any fundamental right.
We now turn to the parallel contention with regard to Bello. At trial the questions at issue were posed by defense counsel on cross-examination in the following form:
Q. You didn't talk to anybody on the Prosecutor's staff last night?
A. No one about this trial.
Q. You talked to someone on the Prosecutor's staff last night, didn't you?
A. Yes, sir.
Q. And didn't you discuss this trial at all?
A. No. sir.
Q. Well, did you discuss what reward you were to get, say in terms of deferring a parole?
A. I was never promised anything from the Prosecutor's Office.
Q. Were you promised anything from anyone else in the form of a reward?
A. No. sir.
Q. You are aware, of course, that there is a reward offered by the Tavern Owners Association, aren't you?
A. I am not aware of anything.
Q. You are not aware of that reward?
A. It is possible, but nobady said anything to me about it.
Q. You are not aware of the fact that the Municipality offered a reward for information? You are not aware of that?
A. Not that I recall.
Q. You are not aware that the Mayor of this city declared that on the very day of the offense in the newspapers of the city?
A. This could be hearsay, I don't recall.
Q. You don't recall.
A. And no one from the Prosecutor's Office promised me anything except protection.
At another point of cross-examination, the following took place.
Q. In return for the statement which you gave in October, October 14, 1966, it is your expectation that you will not have to go back to the Reformatory, isn't that correct?
A. No, sir.
Q. You expect to go back?

*306 A. I expect to be incarcerated somewhere.
Q. For these crimes?
A. For these crimes that I have committed.
A reading of this colloquy between counsel and the witness reflects the ambiguous nature of the questions as well as the answers. The commencement of the interrogation on the subject refers to discussion with members of the prosecutor's staff the previous night. Query: Did the response "I was never promised anything from the Prosecutor's Office" have reference to the previous night? Thereafter, in an unresponsive answer the witness also volunteered, "And no one from the Prosecutor's Office promised me anything except protection."
The other question relating to return to the reformatory sought the subjective reaction of the witness, to which he responded by stating his own expectation. Whether true or not, it was clearly not a fact which could be said to constitute perjury so as to call upon the prosecutor to correct in any manner.
The contention is advanced that the response by the witness that he was not promised anything except protection was false because Lt. DeSimone had promised that there would be no charge brought against Bello involving the Ace Sheet Metal break-in or the removal of the cash from the Lafayette bar, and that defendants were deprived of a fair trial because of the silence by the prosecutor in the face of Bello's testimony.
The court finds as a fact that Bello was promised protection and that he was placed in protective custody at several locations at his own request. This he admitted at trial and thus there is no issue in that regard.
The court also finds that on October 11, 1966, the date when a recorded tape was made of Bello's oral statement, DeSimone did assure the witness that nothing would be done in connection with potential charges for his acts during the early morning of June 17.
*307 It should be noted, however, that the court's factual finding with regard to DeSimone's assurance on this subject is limited to the single occasion on October 11. There is no credible evidence of any such promise or assurance after that date.
It is established that there was no prosecutorial action taken at any time in connection with the Ace job or the petty larceny in the Lafayette bar. Whether this inaction is causally related to DeSimone's assurance is highly questionable in view of subsequent events.
On October 31 and November 30, 1966 Bello was subpoenaed to testify before the grand jury on the facts relating to the murder case. On both occasions, on the advice of his attorney, Joseph M. Harrison, he refused to testify on the ground of self-incrimination unless he was granted immunity. As Mr. Harrison (now Judge Harrison) testified, he conferred with Passaic County Prosecutor Thevos on behalf of Bello, stating that Bello would not testify unless he would be immunized from prosecution for the larceny offenses of June 17. In support of his request for immunity he also suggested that the State could not prove a case against Bello founded upon his prior admissions because the admissions were obtained without adequate Miranda warnings.
Nevertheless, the prosecutor adamantly refused to grant immunity and Bello refused to testify before the grand jury on both occasions. Hence, it follows that regardless of what DeSimone had said prior thereto, as of October 31 and November 30, 1966 Bello and his attorney knew that there were no viable promises or assurances that the larceny offenses would not be prosecuted. In the absence of any other promises subsequent to these grand jury appearances, the conclusion is manifest that as of the time of trial in April and May 1967 Bello truthfully knew and understood that action might be taken against him in connection with the larcenies. Therefore, his testimony at *308 trial that no promises were made except with regard to protection was true, and there was no perjury requiring affirmative revelation by the prosecutor.
The failure to prosecute as an ultimate fact may be attributable to many reasons having no connection with Lt. DeSimone or his assurances. The most obvious reason is that the State could not prove a case against Bello with regard to the Lafayette Bar and Grill theft except through his own words, and with regard to the Ace Sheet Metal job except through his own words or the testimony of his coconspirators. There were no other witnesses. His own admissions could not be used against him at a criminal trial because they were obtained incidental to the murder investigation without the requisite warnings required by the Miranda decision. As to the availability of the testimony of Bello's colleagues against him, that in turn would be extremely questionable for as a practical matter, no codefendant will testify in this manner unless he is granted immunity himself.
In any event, the mere failure to prosecute under these circumstances does not prove the existence of a prior promise or agreement not to prosecute. There is no support for the contention that Bello committed perjury at trial or that the state knowingly permitted this witness to perjure himself.

VIII
During the process of the new trial hearing defendants interposed another ground in support of their motion, contending that the failure of the prosecution to reveal and provide the defense with the October 11 tape constituted a suppression of exculpatory evidence. In the first place, there is no exculpatory material on the tape relating to the substance of the charge. The only reference in the tape to which defendants point is the promise at that time relating to the prosecution for Bello's offenses of June 17. *309 This does not represent withheld exculpatory evidence in the due process sense. In order for the withholding of evidence to be considered as a violation of due process, it must not only be favorable to the defendant but also must be material to the issue of guilt. See Brady v. Maryland, supra.
At best, the tape was but a tool which might or might not have been used by the defense in cross-examination for credibility purposes. As such, the material might have been obtained as a matter of discovery dependent upon the nature of defendant's discovery applications and the discovery rules in vogue in 1966 and 1967. (These rules were far more restrictive for a defendant than our current rules of criminal discovery.)
Nevertheless, even if there were a basis for complaint for failure to provide the tape at or before the trial, the issue involved but a minor discovery problem which would have been cognizable only on direct appeal or post-conviction application within five years. The alleged deprivation does not reach the level of an infirmity affecting the due process requirement of a fair trial. Therefore, the contention in the current proceeding is without merit.

CONCLUSION
The court has attempted, within the limits of its capability, to apply to this case a careful analysis of the record of the trial and the new trial hearing in order to consider all the issues raised by defendants and to articulate the reasoning underlying the conclusions. This effort results in the determination that there is no valid basis for setting aside the jury verdicts which ensued from a full and fair trial.
The motion for a new trial is denied.