THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RUBIN CARTER AND JOHN ARTIS, DEFENDANTS-APPELLANTS.

Argued June 2, 1969—Decided July 15, 1969.

438

*Mr. Raymond A. Brown* argued the cause for appellant Carter.

*Mr. Arnold M. Stein* argued the cause for appellant Artis.

*Mr. Robert H. Altshuler* and *Mr. Vincent E. Hull, Jr.,* Assistant Prosecutors, argued the cause for respondent (*Mr. John G. Thevos,* Passaic County Prosecutor, attorney).

The opinion of the court was delivered by
WEINTRAUB, C. J. Defendants were convicted of three charges of murder in the first degree, and the jury having recommended life imprisonment, sentence was imposed accordingly. Defendants appealed directly to us pursuant to the then rule, *R. R.* 1:2–1(c).

The issue of guilt was strongly contested. The issue was, however, clearly one for the jury and defendants do

not contend otherwise. Our recital of the facts will therefore be limited to that suggested by the legal questions before us.

At about 2:30 A.M. on June 17, 1966 two men entered the Lafayette Bar and Grill in the City of Paterson. One man held a .32-caliber revolver, the other a 12-gauge shotgun. Their motive was obscure, no doubt because events moved so rapidly. We gather from the testimony of the sole surviving victim that the bartender saw the armed men as they entered and threw a bottle at them, precipitating the shooting before a word was said. The bartender was killed instantly, as was also one of the patrons. Another patron, Mrs. Tanis, who suffered multiple wounds, died four weeks later. The lone survivor, also a patron, was shot in the head. His ability to tell what happened was obviously impaired; he could contribute little more than that the armed men were Negroes. The State failed in its effort to prove a dying declaration by Mrs. Tanis. We know only that she and also the surviving patron were unable to identify either defendant, but the testimony does not suggest that either patron was able to say affirmatively that the defendants were not the offenders.

Mrs. Valentine, who lived above the tavern, was awakened by the shots. She went to the window and saw two men run from the sidewalk in front of the tavern to a white automobile parked across the street, about a car-width from the curb. Mrs. Valentine could not see their faces but observed that they were Negroes, that the license plate had a dark background with gold or yellow lettering, and that the rear lights were triangular in shape, tapering toward the center. She hurried to the tavern, where she met one Alfred Bello, who urged her not to enter. She nonetheless did, saw the gory scene, returned to her apartment, and telephoned the police.

Alfred Bello was a key witness for the State. He and Arthur Dexter Bradley were in the area on a criminal mission of their own. Bradley was attempting to break into a building about two blocks away while Bello was at the intervening

intersection looking out for the police. Bello ran out of cigarettes and was walking to the tavern to buy some when he heard the shots. As he neared the tavern, two men, Negroes, came toward him, one with a shotgun and the other with a pistol. They were talking loudly and laughing. When Bello realized they were not detectives, he took off and ducked into an alleyway. Presently a white car passed by. Bello recognized it as a 1966 Dodge and noted it had New York license plates. Bello entered the tavern, and seeing the dead and the dying, he went to the cash register to obtain a dime to call the police. The sight of money was too much for Bello who, explaining he was a thief, admitted he scooped some bills from the register. He left the tavern and handed the money to Bradley who, having heard the shots, had started toward the scene,. Bello returned to the tavern. He called, or had already called, the police, and when they arrived, he flagged them down.

At 2:34 A.M. patrol cars were alerted for a white car with two Negro occupants. At 2:40 A.M. Sergeant Capter and his colleague stopped a white car with three Negro occupants. Defendant Artis was driving and defendant Carter was in the rear seat. Carter, a professional pugilist, was well known to Sergeant Capter. After checking the registration, the officers permited the car to proceed. The officers then went to the tavern, and learning that Mrs. Valentine and Bello had given the additional information that the car had out-of-state plates and that the rear lights looked like "butterfiies," they took off to search for the car they had stopped, for that car had New York plates and its rear lights answered the description given by Mrs. Valentine and Bello.

The car was located. Artis and Carter were then the only occupants. They were ordered to drive to the tavern in an escort of police cars. When they arrived, Mrs. Valentine identified the car as the one she had seen. By then a large crowd had gathered. The car was taken by the police to headquarters where it was impounded. At 3:45 A.M. a search of the car yielded a live .32-caliber S. & W. long

bullet, found on the floor under the right front seat, and a live 12-gauge shotgun shell, found in the trunk under boxing gear. A motion to suppress those items was denied, but at the trial the shotgun shell was excluded upon other grounds to which we will refer later. One of the issues on this appeal involves the denial of the motion to suppress, and defendant Carter, in his *pro se* brief, contends also that he was prejudiced because the State referred in its opening to the shotgun shell which was later barred from introduction.

Both Carter and Artis were questioned early that morning. Both denied involvement. A detective was permitted to testify to each defendant's account of where he had been that night. The admission of that testimony is an issue on this appeal. Both defendants were released that morning. On June 29, twelve days later, both Artis and Carter testified voluntarily before the Grand Jury after signing appropriate waivers.

Defendants were not arrested again until October, when Bello and Bradley, both involved in other criminal charges, provided evidence directly incriminating the defendants. Bello said it was Carter who carried the shotgun and Artis who held the pistol; that he recognized both at once when he was confronted by them outside the tavern, and that he had withheld this information because of his own criminal activities that night and his fear of retaliation. Bradley, who also saw both men, testified that Carter was one of them. He was unable to say whether Artis was the other.

Both Carter and Artis testified. They produced a number of witnesses in an effort to place themselves at a bar at the time of the murders. It, however, was virtually impossible to establish an alibi, for at all times defendants were concededly within minutes of the murder scene and the moment of the killings could not be established precisely. It is fair to say that the case had to turn upon the State's proof and the defendants' denial of guilt, unaided by the testimony which sought to establish an incompatible presence elsewhere.

## I

As related above, the State was permitted to prove the accounts Carter and Artis gave a detective shortly after their arrests of their movements on the night of the homicides. The evidence did not consist of statements signed by defendants. Nor was it even a verbatim record of what was asked and said. Rather it consisted of notes made by a detective who could not write shorthand and who had difficulty staying abreast of what the defendants said, and who did not exhibit the notes to defendants for their confirmation. Thus, in its form, the evidence was poorly prepared. See *State in the Interest of Carlo*, 48 *N. J.* 224, 242 (1966); *State v. Cook*, 47 *N. J.* 402, 417–418 (1966); *State v. Smith*, 32 *N. J.* 501, 549–555 (1960), *certiorari* denied, 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961). We add that the State failed to seek a pretrial determination of the compatibility of those statements with a joint trial as required by *State v. Young*, 46 *N. J.* 152 (1965), which omission, although not fatal, see *State v. Gardner*, 54 *N. J.* 37, 42–45 (1969), foreclosed an opportunity for more deliberate consideration of the problem the statements generated at the trial.

At any rate, the affirmative probative value of those oral statements was virtually nil. Their only contribution was the admission by each defendant that he was in the company of the other during a period within which the homicides were probably committed. It was on that basis that the trial court accepted the statements. But that contribution was hardly needed in light of the testimony of the officers which placed defendants in Carter's car at 2:40 A.M., probably within ten minutes after the shootings.

Neither statement was at all inculpatory of either man. Both stoutly denied any involvement. Defendants nonetheless complain that the accounts they gave of their peregrinations earlier that night had certain conflicts which a jury might find to reflect upon the credibility of the other, notwith-

standing the trial court's immediate and plain instruction to the jury that neither statement could be used in any wise against the other defendant.

Defendants contend the admission of the detective's testimony violated *Bruton v. United States*, 391 *U. S.* 123, 88 *S. Ct.* 1620, 20 *L. Ed.* 2d 476 (1968). In that case, decided long after the trial of the matter before us, but nonetheless applicable retroactively to it, *Roberts v. Russell*, 392 *U. S.* 293, 88 *S. Ct.* 1921, 20 *L. Ed.* 2d 1100 (1968), the United States Supreme Court repudiated *Delli Paoli v. United States*, 352 *U. S.* 232, 77 *S. Ct.* 294, 1 *L. Ed.* 2d 278 (1957), and held a defendant's constitutional right may be offended if a codefendant's confession, which also implicates the defendant, is admitted at the joint trial even though the trial court instructs the jury that the confession shall not be used against him. The basis of that result was a belief that a jury could not honor such an instruction. The Supreme Court put it this way (391 *U. S.*, at 126, 88 *S. Ct.*, at 1622, 20 *L. Ed.* 2d, at 479):

"* * * We hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment * * *"

The State answers that, even if the situation otherwise is within *Bruton*, yet the "right of cross-examination secured by the Confrontation Clause" was accorded, since both Carter and Artis took the stand and each was in fact questioned freely by counsel for the other. *State v. Gardner, supra*, 54 *N. J.*, at 43–46; *Santoro v. United States*, 402 *F.* 2d 920 (9 *Cir.* 1968); *Rios-Ramirez v. United States*, 403 *F.* 2d 1016 (9 *Cir.* 1968); *People v. Camarillo*, 72 *Cal. Rptr.* 296 (*Ct. App.* 1968); *Lipscomb v. State*, 5 *Md. App.* 500, 248 *A.* 2d 491 (*Ct. Spec. App.* 1968); *State v. Justice*, 3 *N. C. App.* 363, 165 *S. E.* 2d 47 (*Ct. App.* 1969); see dissent in

*Harrington v. California*, 395 *U. S.* 250, 89 *S. Ct.* 1726, 23 *L. Ed.* 2d 284 (1969); *cf. United States v. Guajardo-Melendez*, 401 *F.* 2d 35 (7 *Cir.* 1968), and *Bujese v. United States*, 392 *U. S.* 297, 88 *S. Ct.* 2064, 20 *L. Ed.* 2d 1113 (1968), vacating judgment in *United States v. Bujese*, 378 *F.* 2d 719 (2 *Cir.* 1967), and remanding for further consideration in light of *Bruton*.

But defendant Carter says this answer is inadequate because Artis denied saying some of the things the detective attributed to him, and hence in those respects Carter was "denied" his right of cross-examination. He cites *Townsend v. Henderson*, 405 *F.* 2d 324 *p.* 329 (6 *Cir.* 1968), where the court said:

> "The only possible distinction between the present case and *Bruton* is that in *Bruton* the codefendant did not take the witness stand, whereas here Terry did testify in his own behalf. But, this distinction is unimportant since, although Terry was called as a witness, he denied making the confession. Townsend therefore had no effective right of cross-examination in regard to the confession. A similar question was presented in Douglas v. Alabama, 380 U. S. 415, 420, 85 S. Ct. 1074, 1077, 13 L. Ed. 2d 934 (1965), and it was there held 'effective confrontation of Loyd was possible only if Loyd affirmed the statement as his.' "

No doubt the *Bruton* problem is not obviated merely because a confessing codefendant takes the stand and testifies fully, for if upon the conclusion of his testimony the statement inculpating the defendant is not evidential against the defendant for any reason whatever, the question remains whether the jury could abide by a limiting instruction. Whether, in such circumstances, it is technically correct to say the Confrontation Clause, rather than due process, is affronted, is an academic matter we need not pursue, for it is clear that the situation before us does not harbor the danger with which *Bruton* was concerned.

None of the portions of the statement Artis disavowed could have incriminated Carter in the least. Indeed, no part of either statement constituted an admission of guilt or in

any way inculpated the other defendant. Beyond the admission by each man that he was in the company of the other at about the probable time of the shooting, a fact not contested at the trial, neither statement could have had any meaningful impact. In fact, the prosecutor made but scant reference to those statements in his summation and no effort at all to pit one against the other. The focus of the State's summation with respect to the "alibi" was upon the proof defendants themselves adduced concerning the period from 2:00 A.M. on. The State stressed the shortcomings inevitable when witnesses, all patrons at bars who had no real reason to recall the night in question or to relate casual events to passing time, attempted to pinpoint events.

In this context, we see no problem of *Bruton* proportions. The Supreme Court indicated what it had in mind and what was beyond its ruling in these terms (391 *U. S.*, at 135–136, 88 *S. Ct.*, at 1627, 20 *L. Ed. 2d*, at 484–485:

"* * * Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. 'A defendant is entitled to a fair trial but not a perfect one.' * * * It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless, as was recognized in Jackson v. Denno [378 U. S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908], supra, there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. * * * Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed."

Here there was no confession by either defendant, and neither man in his statement cast a shadow upon the other. The jury was not asked to perform the feat of accepting one defendant's confession as true and simultaneously ignoring its accusation against another. See *United States v. Hoffa*, 402 *F. 2d* 380, 386–387 (7 *Cir* 1968); *United States v. Lipowitz*, 401 *F. 2d* 591 (3 *Cir.* 1968); *United States v. Zeiler*, 296 *F. Supp.* 224, 226 (*W. D. Pa.* 1969).

And if what here occurred could be thought in some way to be error under *Bruton*, the error must be deemed to be harmless within the concept of *Harrington v. California*, 395 *U. S.* 250, 89 *S. Ct.* 1726, 23 *L. Ed. 2d* 284 (1969).

## II

As related above, a search of Carter's automobile revealed a live .32-caliber bullet and a live 12-gauge shotgun shell. The trial court denied a timely motion to suppress.

There was no search warrant. The State relies upon the right to search as an incident to the arrest. Defendants deny there was probable cause for the arrest and deny too that the search was incidental to it.

As to the arrest, the trial court correctly held that probable cause existed. Whether the arrest occurred when defendants were ordered to drive in the convoy to the tavern or when they were placed in the police van at the tavern is not critical. Probable cause existed at both times, and the search, which took place after the second event, was incidental to it.

Probable cause has never been defined precisely. As we said in *State v. Davis*, 50 *N. J.* 16, 23 (1967):

"* * * It is something less than proof needed to convict and something more than a raw, unsupported suspicion. It is a suspicion (or belief) of guilt that is 'well grounded.' *State v. Burnett*, 42 *N. J.* 377, 387 (1964); *State v. Contursi*, 44 *N. J.* 422, 429–430 (1965). The emphasis is upon a practical, realistic view of law enforcement, in recognition of the primacy of the individual's right to be safe from attack.

Thus *Beck v. State of Ohio*, 379 *U. S.* 89, 91, 85 *S. Ct.* 223, 13 *L. Ed.* 2d 142, 145 (1964), repeats from *Brinegar v. United States*, 338 *U. S.* 160, 176, 69 *S. Ct.* 1302, 93 *L. Ed.* 1879, 1891 (1949), that the rule of probable cause is 'a practical, nontechnical conception' designed to afford 'the best compromise that has been found for accommodating * * * often opposing interests,' and that

'* * * Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.'

Beck adds from *Ker v. State of California, supra*, 374 *U. S.* 23, 83 *S. Ct.* 1623, 10 *L. Ed.* 2d 726, that the States may develop 'workable rules' to meet 'the practical demands of effective criminal investigation and law enforcement,' within the limits of the Constitution. (379 *U. S.*, at *p.* 92, 85 *S. Ct.*, at *p.* 226, 13 *L. Ed.* 2d, at *p.* 145.)"

Here the police were confronted with heinous crimes. Four persons had been shot. Two were dead and two were gravely wounded. An automobile had been used, and thus immediate action was imperative if the hit-and-run killers were to be apprehended. The search was for occupants of a white automobile. There of course is nothing uncommon about a white automobile, but several facts limited the number of suspect cars. To begin with, it was early morning, when traffic had to be relatively light. The police were told the killers were Negroes; that the car bore New York plates; and that the rear lights looked like butterflies. There would not likely be many vehicles in the vicinity which would meet all of those specifics. Finally, when defendants were brought to the scene, Mrs. Valentine identified the car as the one she had observed right after the shooting. Under these circumstances, good ground existed to suspect defendants of the crimes, and to arrest them. That after further investigation the same morning the police decided to release defendants does not militate against this view.

As to the search of the vehicle, the additional facts are these: When defendants arrived under escort at the tavern, a large crowd was present. The police sensibly attempted no search in the street but did seize the car and did remove it to headquarters where it could be searched. The search occurred at 3:45 A.M., which, we gather, was about 20 minutes

after the car had been delivered to headquarters and there impounded. Defendants were then being interrogated. It was important to know quickly whether the car held evidence of guilt. The State had to know whether it was pursuing a false lead, and, if it was, it was also to defendants' interest for the State to know this at once.

The Fourth Amendment prohibits only searches and seizures which are unreasonable. The automobile was seized in front of the tavern, as it had to be if evidence of guilt was to be preserved from possible destruction by the suspects or someone acting for them. We do not see how the seizure of the car without a search warrant can be even remotely questioned. The issue then is whether the State needed a search warrant to examine something it had properly seized.

We have held in a series of cases that (1) a search under such circumstances is not so remote in point of time and place to be other than incidental to the arrest, and (2) in any event, the automobile having been seized as an instrumentality of crime and held for its evidential value, there is no more reason to require a warrant to search this instrumentality of crime than to require a warrant "to examine or to test a weapon, or to open the brown bag or valise seized as an instrument used in a bank robbery to see if the stolen money is there." *State v. McKnight*, 52 *N. J.* 35, 57–58 (1968) ; *State v. Zito*, 54 *N. J.* 206 (June 26, 1969) ; *State v. Barnes*, 54 *N. J.* 1, 8–10 (1969) ; *State v. Boykins*, 50 *N. J.* 73 (1967) ; *State v. Fioravanti*, 46 *N. J.* 109, 121–124 (1965), *certiorari* denied, 384 *U. S.* 919, 86 *S. Ct.* 1365, 16 *L. Ed. 2d* 440 (1966).

After the argument of this appeal, the United States Supreme Court handed down *Chimel v. California*, 395 *U. S.* 752, 89 *S. Ct.* 2034, 23 *L. Ed. 2d* 685 (June 23, 1969), in which a series of cases was repudiated and an earlier concept revived. The result is to limit a search incidental to an arrest to a search for weapons or evidence within the physical reach of the person arrested, thereby to prevent his use of the weapons or destruction by him of such evidence. Beyond

that, at least absent some exigency, the police must obtain advance judicial approval of searches and seizures through the warrant procedure.

We do not know what retroactive effect, if any, the Supreme Court will give *Chimel*. The discussion which follows should not be read to mean that we will accord the case retroactivity beyond that which the Supreme Court may require. Our own disposition is very much against retroactive application of new constitutional concepts, and especially so when they repudiate decisions theretofore relied upon by enforcement authorities.

The majoriy opinion in *Chimel* referred to *Preston v. United States,* 376 *U. S.* 364, 84 *S. Ct.* 881, 11 *L. Ed. 2d* 777 (1964), but footnote 9 makes it clear that the thinking of *Chimel,* which involved the search of a home, may not be applied literally to a motor vehicle. That footnote reads (395 *U. S.,* at *p.* 764, 89 *S. Ct.,* at *p.* 2040, 23 *L. Ed. 2d,* at *p.* 694):

> "Our holding today is of course entirely consistent with the recognized principle that, assuming the existence of probable cause, automobiles and other vehicles may be searched without warrants 'where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' *Carroll v. United States,* 267 *U. S.* 132, 153, 45 *S. Ct.* 280, 285, 69 *L. Ed.* 543; see *Brinegar v. United States,* 338 *U. S.* 160, 69 *S. Ct.* 1302, 93 *L. Ed.* 1879."

The majority does not reject *Cooper v. California,* 386 *U. S.* 58, 87 *S. Ct.* 788, 17 *L. Ed. 2d* 730 (1967), which upheld a search without a warrant made long after the vehicle was impounded as a forfeitable instrument of crime. See *Dyke v. Taylor Implement Mfg. Co.,* 391 *U. S.* 216, 221–223, 88 *S. Ct.* 1472, 20 *L. Ed. 2d* 538, 543–544 (1968). For the reasons we gave in our cases cited above, we are satisfied the search here made comported with the Fourth Amendment.

Automobiles are a major tool of crime. Concepts relevant to a home or other fixed place cannot be applied to a moving vehicle. The Fourth Amendment speaks of "unreasonable

searches and seizures." If the "seizure" is reasonable, it would be remarkable to find that "search" of that which has been seized is unreasonable. It would be ritualistic at best to require an application for a warrant to search for the unknown something which a search of the seized car may or may not reveal. Nothing in the phrasing or history of the Fourth Amendment requires that needless restriction upon law enforcement. And, we add, the true issue is not the meaning of the Fourth, but whether the untarnished truth should be suppressed if the Fourth was not satisfied, and this at the expense of the first right of the individual to be protected from criminal attack. We can see no gain here which could compensate for the hurt which suppression of the truth must inflict upon the liberty of the individual. *State v. Gerardo,* 53 *N. J.* 261 (1969).

We mentioned earlier a companion point raised by defendant Carter in his *pro se* brief. The .32-caliber bullet was admitted into evidence, but the 12-gauge shotgun shell was excluded. Carter says he was prejudiced because the State in its opening said it would prove the shotgun shell was in the car. The State's opening statement was made in good faith. The pretrial motion to suppress had been denied. The shotgun shell was excluded upon a different thesis, namely, that although competent and probative, the shell held a potential for prejudice which outweighed its probative contribution. We disagree with that ruling, and see no distinction in this regard between the unspent bullet and the unspent shotgun shell. Both differed from the ammunition actually used, but both could be fired by the weapons which were used. Although the car was a rented vehicle, it had been in Carter's continuous possession for some three months before the fatal events. We state our view on the admissibility of the evidence, not because it answers the complaint before us, for the shell was excluded and we cannot know whether there was some proof Carter would have advanced had the shell been admitted, but rather to emphasize the good faith of the prosecutor's opening statement. The precise question

is whether harm should be assumed because the State did not succeed in proving a fact it mentioned in the opening. The jury understood the case was to be decided on the evidence before it. We cannot speculate that the jury nonetheless gave credence to the opening statement despite the State's failure to prove it.

## III

We have considered the remaining points pressed by defendants, and find no basis for reversal in any of them. We need mention but some.

The trial court correctly found that defendants were fully informed of their constitutional rights before they gave their oral statements, already mentioned, on the morning of the crimes.

██ The defense cross-examined Bello on the basis of his statement to the police made on the day of the homicides and his later statement in October when he identified defendants as the offenders. The trial court permitted the State on redirect to refer to other parts of those statements. We see no error in that ruling.

It is contended the trial court interfered with the trial. The record does not sustain the charge. The trial was hotly contested. The case was tried fully, and, we add, at length. The defense was permitted a wide range in its examination of witnesses and argument of legal issues. At times the trial court stepped in to keep matters in hand, but we see no misuse of its discretion. The trial was conducted with fairness.

██ The remaining point which should be mentioned relates to sentence. Three life sentences were imposed upon each defendant. Two consecutive life sentences were imposed upon Carter, with the third life sentence to be concurrent with the second life term. As to Artis, the three life terms were concurrent. With respect to the claim that there was but one offense, we think it evident that three distinct homicides were committed by separate and distinct criminal

acts. *State v. Maxey,* 42 *N. J.* 62 (1964). The situation is unlike that in *State v. Mills,* 51 *N. J.* 277, 289–290 (1968), where multiple deaths resulted from a single act of arson. Nor does the case involve the problem of *State v. Hoag,* 21 *N. J.* 496 (1956), affirmed, 356 *U. S.* 464, 78 *S. Ct.* 829, 2 *L. Ed. 2d* 913 (1958), whether an acquittal as to one of several charges should be deemed to establish the defendant's innocence of the companion charge and hence to bar the State from prosecuting the remaining charge. With respect to the imposition of consecutive life sentences upon Carter, the issue is controlled by *State v. Maxey, supra,* 42 *N. J.* 62.

The judgments are therefore affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN — 7.

*For reversal* — None.